COMMONWEALTH *vs.* RICHARD L. BASSETT
(and nine companion cases[1]).

Barnstable.  November 14, 1985. — March 24, 1986.

Present: GREANEY, C.J., CUTTER, & WARNER, JJ.

*Evidence,* Impeachment of credibility, Corroborative evidence. *Practice, Criminal,* Argument by prosecutor, Instructions to jury. *Identification.*

At a criminal trial, the cumulative effect of the prosecutor's improper argu-
ments, which encouraged the jury to consider for substantive purposes
the criminal convictions of a witness, the defendant's sister, and which,
without a proper evidentiary foundation for doing so, referred to the
failure of alibi witnesses to report information to the police, went to the
heart of the defendant's coupled claims of alibi and misidentification
and, when considered with erroneous language in the judge's charge to
the jury, presented a substantial risk of a miscarriage of justice, neces-
sitating reversal of the defendant's convictions. [717-718]

At the trial of indictments for assault with intent to murder, and other serious
crimes, it was error to receive in evidence for its probative worth a
police officer's testimony as to the victim's reaction on selecting the
defendant's photograph from a police "mug book", where, although the
victim identified the defendant in court, he did not acknowledge that he
had made any identification from the array of photographs shown him
by police. [718-720]

INDICTMENTS found and returned in the Superior Court De-
partment on September 18, 1984.

The cases were tried before *Augustus F. Wagner, Jr.,* J.

*Hugh Samson* for Richard L. Bassett.

*Thomas C. Federico,* Committee for Public Counsel Serv-
ices, for Joseph S. Walmsley.

*Michael D. O'Keefe,* Assistant District Attorney, for the
Commonwealth.

WARNER, J. After a jury trial in the Superior Court, the
defendants were convicted of assault with intent to murder

[1] Four of the companion cases are against Bassett and five are against
Joseph S. Walmsley.

(G. L. c. 265, § 15), mayhem (G. L. c. 265, § 14), assault with intent to rob (G. L. c. 265, § 20), and assault and battery with a dangerous weapon (G. L. c. 265, § 15A). In addition, Walmsley was convicted of assault with intent to rape (G. L. c. 265, § 24). The defendants' appeals raise discrete issues.*

There was evidence from which the jury could find the following. On the evening of July 16, 1984, the victims, a man and a woman, were drinking beer in the woman's room in a boarding house. The landlady, complaining of too much noise, asked the victims to leave. They proceeded to a store to purchase some ice with which to treat a cut the woman had suffered in a fall; then to a liquor store to purchase beer and a half-gallon of vodka. The victims arrived at a cemetery about 11:00 P.M. and began drinking the vodka and beer "chasers"; they were "high," if not drunk. Some time during that night or in the early morning hours of July 17, the victims were approached in the cemetery by two males, one black and the other white, and severely beaten and cut. The woman was sexually assaulted. Both victims were knocked unconscious. A police officer discovered them on the morning of July 17. They were then disoriented and confused; the man was not coherent.

1. *Bassett's case.* (a) Shortly after the incident, one Barbara Bearse told a police detective that a black male named Richard Barrows had confessed to her that he had beaten the victims. At a District Court probable cause hearing, Bearse so testified. When she was arrested on a bench warrant and brought to court during the trial, Bearse informed the prosecutor that she intended to recant her prior testimony; she would, and did, testify at trial that it was Bassett who confessed to the beatings. Bearse's prior testimony was induced, she said, by the suggestion of Bassett's sister, Linda, and by graphic threats of harm by Linda to Bearse's daughter. Linda denied making any such suggestion or threat. On cross-examination, the prosecutor introduced records of convictions of Linda for assault and battery with a dangerous weapon and for armed robbery. There was no evidence that Bearse knew of the convictions. At the close of Linda's testimony, the judge instructed the jury that the

---

* We note that defense counsel on this appeal were not trial counsel.

convictions could only be considered on the question of Linda's credibility.

In his closing argument the prosecutor argued:

"Now let's look at the defense for just a minute, ladies and gentlemen. What have we heard? We heard from Linda Bassett, who has been convicted of assault and battery with a dangerous weapon, armed robbery, and sentenced on both of them. You don't think she is capable of threatening Barbara Bearse? And you don't [think] Barbara Bearse is genuinely in fear of that one? I would suggest she is."

The prosecutor later commented:

"Why was [Barabara Bearse] afraid? You consider what you heard from Linda Bassett. You consider her record and you will know why she was afraid."

In his final instructions to the jury, the judge first correctly told them that convictions could "be used for one purpose and that is in determining what the credibility is of that particular individual." He continued, however, and allowed the jury to consider the convictions for substantive purposes:

"Also, [convictions] to some extent, can be introduced for a very limited purpose, because there is some indication in this case that [Linda Bassett] may have a propensity for violence or making threats. Are you satisified that that type of activity that was indicated by those convictions assist [*sic*] you in understanding that or in drawing that conclusion, then you may use them for that limited purpose also."

Contrast the instructions given in *Commonwealth* v. *Roberts,* 378 Mass. 116, 127 (1979). Contrast also *Commonwealth* v. *Fontes,* 396 Mass. 733, 734-737 (1986) (adopting a rule that in a homicide case recent specific instances of a victim's violent conduct, known to a defendant, are admissible to show that the defendant acted justifiably in self-defense). There was no objection to either the prosecutor's argument or the judge's instruction.

A witness's prior criminal convictions may be used for the limited purpose of impeachment. They may not be considered for the substantive purpose of establishing the propensity of the witness to do an act or commit a crime. See G. L. c. 233, § 21; *Commonwealth* v. *Roberts, supra* at 126-129; *Commonwealth* v. *Felton,* 16 Mass. App. Ct. 63 (1983); Liacos, Massachusetts Evidence 149-156 (5th ed. 1981 & Supp. 1985). The prosecutor's argument was improper, and the judge's instructions were in error.

(b) Bassett presented several alibi witnesses. On cross-examination, the prosecutor elicited from two of them that they were friends of Bassett and would like to help him.[2] Another witness testified that he had been aware of the charges against the defendant. None of the alibi witnesses was asked if he or she had gone to the police to report information which would be helpful to Bassett.

During closing argument the prosecutor said:

> "Why all of a sudden are all those people marching in here and telling you what happened on the 16th? Did any of them ever tell the police? Was there ever a suggestion in questions by counsel for the defense that these people had made statements to the police about any of this? All of a sudden now, everybody knows and everybody remembers what happened on Monday, the 16th. I would suggest they didn't. I would suggest that it is all contrived. It is designed to confuse you, just as Detective Rivers was confused by the nonsense told to him by Barbara Bearse as put up to by Linda Bassett. That right away Mr. Bassett was constructing his alibi for this and trying to distance himself from the whole affair."

In *Commonwealth* v. *Brown,* 11 Mass. App. Ct. 288, 296-297 (1981), we said: "[S]ome caution is appropriate before a witness's failure to report his information to Commonwealth authorities is introduced to impeach his trial testimony. . . .

---

[2] One of these witnesses also said he had "heard about the whole case" three days after the incident.

[W]e think that the prosecutor should lay a foundation for this type of cross-examination by first establishing that the witness knew of the pending charges in sufficient detail to realize that he possessed exculpatory information, that the witness had reason to make the information available, that he was familiar with the means of reporting it to the proper authorities, and that the defendant or his lawyer, or both, did not ask the witness to refrain from doing so." Accord *Commonwealth* v. *Berth,* 385 Mass. 784, 790-791 (1982); *Commonwealth* v. *Egerton,* 396 Mass. 499, 507 (1986). Here, the prosecutor did not lay the proper foundation for the reasons, if no other, that there was no evidence that (1) the witnesses were familiar with the means of reporting to the proper authorities, (2) the defendant or his lawyer, or both, did not ask the witnesses to refrain from doing so, and (3) the witnesses did not in fact report to the police. The prosecutor's remarks were improper. See *Commonwealth* v. *Shelley,* 374 Mass. 466, 470 (1978); *Commonwealth* v. *Clary,* 388 Mass. 583, 590 (1983).

In the absence of objection to either the prosecutor's closing argument or to the judge's instructions, we confine our review to a determination whether there is a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Freeman,* 352 Mass. 556, 563-564 (1967); *Commonwealth* v. *Clary, supra* at 590. We conclude that there is such a risk, particularly in view of the cumulative effect of the errors we have described.

The case against Bassett was based on the male victim's pretrial[3] and in-court identifications and Bearse's changed testimony as to Bassett's confession to her. The female victim did not identify Bassett before or at trial. The Commonwealth's case was far from overwhelming. The prosecutor's improper

---

[3] The pretrial identification contained elements of suggestiveness. The victim had given no description of the white assailant. At the police station on August 3, 1984, a police detective asked the victim if Rickie Bassett was the one who had assaulted him. This was the first time the victim had heard Bassett's name in connection with the incident. The victim said that it was Bassett. The detective then asked: "Are you very, very, very sure, Doug?" The victim answered that he was sure. The victim had had trouble with Bassett on two occasions prior to the incident. Bassett had allegedly taken money from the victim about a week before, and the two had a verbal altercation two to three years before.

argument and the judge's erroneous charge went to the heart of Bassett's coupled claims of alibi and misidentification. See *Commonwealth* v. *Shelley, supra* at 470-471. The remarks and instructions with respect to the prior convictions of Linda Bassett bolstered the testimony of Bearse, a witness who acknowledged perjury at the probable cause hearing. The jury were not, of course, required to believe her trial testimony. The prosecutor's unfounded comments on the failure of alibi witnesses to go to the police suggested, in express terms, contrivance of the alibi by Bassett. The judge's general instructions on closing arguments not being evidence "could not have served to neutralize the prejudicial effect of the prosecutor's remarks." *Id.* at 471.

(c) In view of our disposition, it is unnecessary to address other issues raised by Bassett. We comment only that in any retrial instructions on assault with intent to murder should follow closely the teaching of *Commonwealth* v. *Henson,* 394 Mass. 584, 590-592 (1985), and the Supreme Judicial Court's decision in *Commonwealth* v. *Ennis,* 20 Mass. App. Ct. 263 (1985), further app. rev. granted, 396 Mass. 1101 (1985), if it has been handed down at the time.

2. *Walmsley's Case.* (a) The Commonwealth's case against Walmsley hinged entirely on identification of him as the black assailant by the male victim.[4] Prior to trial, the male victim had given the police inconsistent descriptions of the black assailant. He made an in-court identification of Walmsley as the black assailant. While the male victim testified on direct examination that he had viewed "mug shots" at the police station, he did not testify that he made any identification from those photographs. Later in the Commonwealth's case, a police officer testified on direct and redirect examination that on August 9, 1984, he observed the victim select a photograph of Walmsley as one of the assailants from a "mug book" of black

---

[4] The female victim never identified either of the defendants as her assailant. Prior to trial she had given the police the name of another man as the black assailant. The physical characteristics of that man, as described by the female victim, differed materially from Walmsley's physique. The male victim had given police the same name.

males. The officer testified that when the victim looked at the 227th photograph "his head did like a double-take at the picture and I actually saw [the victim] start to flinch as he looked at the picture. I said nothing at that time and I waited for a while. I said 'Do you see something Doug?' and at that time he said, 'That's him right there.' He pointed at Mr. Walmsley's picture." The "mug book" containing Walmsley's photograph was admitted in evidence. The defendant did not object to the police officer's testimony or to the exhibit.

On appeal, relying on *Commonwealth* v. *Daye,* 393 Mass. 55, 58-63 (1984), Walmsley argues that the admission of the police officer's testimony and the photograph of Walmsley was error. In the absence of objection at trial, we confine our review to a determination whether there is substantial risk of a miscarriage of justice. See *Commonwealth* v. *Moffett,* 383 Mass. 201, 211 (1981).

In *Commonwealth* v. *Daye, supra* 60-62, the Supreme Judicial Court answered in the negative "[t]he question . . . whether testimony by a person other than the identifying witness concerning an extrajudicial identification is admissible for its probative worth when the identifying witness does not acknowledge the identification or does not explicitly state that he identified the defendant." *Id.* at 60. "Prior identifications are admissible as probative evidence notwithstanding their hearsay attributes because of the superior probative worth of an identification made closer in time to the events in question. *Commonwealth* v. *Weichell,* 390 Mass. 62, 71 (1983); *id.* at 87 (Liacos, J., dissenting). Where, however, the extrajudicial identification is established not by the identifying witness but by a person who observed the identification, we believe that probative worth is outweighed by 'the hazard of error or falsity in the reporting.' McCormick, The Turncoat Witness: Previous Statements as Substantive Evidence, 25 Tex. L. Rev. 573, 588 (1947)." *Id.* at 61. See *Commonwealth* v. *Mendrala,* 20 Mass. App. Ct. 398, 400-401 (1985); *Commonwealth* v. *Seminara,* 20 Mass. App. Ct. 789, 796 (1985).

Here, the jury were allowed to consider the police officer's testimony of the victim's extrajudicial identification for its

probative worth when there had been no testimony as to that identification from the victim. The extrajudicial identification was allegedly made about three weeks after the incident. The victim's in-court identification was made on October 29, 1984. The police officer's testimony, coming after the victim's in-court identification had been weakened by cross-examination as to inconsistent descriptions of the black assailant prior to trial, was powerful. The references in testimony to "mug shots" and the "mug book" improperly suggested that Walmsley had a prior criminal record. See *Commonwealth* v. *Blaney,* 387 Mass. 628, 637-638 (1982). "[A]s a tangible link to [Walmsley] which the jurors could see and ponder during their deliberations, the picture [which the jury knew was a "mug shot" from a "mug book" of black males] was quite strong." *Commonwealth* v. *Seminara, supra* at 797. The prosecutor pointed to the extrajudicial indentification in his closing argument. In his instructions to the jury, the judge put that identification on a par with the in-court identification.

The Commonwealth's reliance on other decisions of the Supreme Judicial Court for the proposition that the disputed evidence could be considered by the jury for either its corroborative or its probative worth is misplaced. In each of those cases, the testimony of the nonidentifying witness followed the explicit testimony of the identifying witness with respect to an extrajudicial identification of a defendant. See *Commonwealth* v. *Denault,* 362 Mass. 564, 566-567 (1972); *Commonwealth* v. *Sheeran,* 370 Mass. 82, 87 (1976); *Commonwealth* v. *Vitello,* 376 Mass. 426, 459-460 (1978); *Commonwealth* v. *Repoza,* 382 Mass. 119, 129-130 (1980). See also *Commonwealth* v. *Daye,* 393 Mass. at 60 n.8.

We conclude that as to Walmsley also there is a substantial risk of a miscarriage of justice and reverse the judgments.

(b) In view of our disposition, it is unnecessary to address other issues raised by Walmsley. However, we comment briefly about some issues which may arise on retrial. The question of severance of Walmsley's trial on account of the testimony of Barbara Bearse that the defendant Bassett had made a confession to her should be addressed in a pretrial motion.

See Mass.R.Crim.P. 9(d) (2), 378 Mass. 860 (1979). The guidelines enunciated in *Commonwealth* v. *Blaney, supra* at 634-639, should be observed with the introduction of any mug shot photograph. If there is a request for an instruction on good faith mistaken identification, it should be given. See *Commonwealth* v. *Pressley,* 390 Mass. 617 (1983). An instruction on prior inconsistent statements should follow *Commonwealth* v. *Costa,* 354 Mass. 757 (1968). See *Commonwealth* v. *Martin,* 19 Mass. App. Ct. 117, 119-120 (1984).

*Judgments reversed.*

*Verdicts set aside.*