## COMMONWEALTH *vs.* JEFFREY MORGAN.

No. 89-P-290.

Middlesex. March 7, 1991. - June 18, 1991.

Present: SMITH, FINE, & GREENBERG, JJ

*Identification. Evidence*, Hearsay, Identification. *Error*, Harmless. *Practice, Criminal*, Motion to suppress, Grand jury proceedings, Verdict.

At a robbery trial in which none of the witnesses was able to make an in-court identification of the defendant, it was error to admit testimony by a police officer as to his observation of a person's extrajudicial identification, which had included a description of the robber's clothing, where that person, in testifying as a prosecution witness, did not acknowledge giving the officer a description of the robber's clothing and where his in-court testimony varied considerably from the earlier descriptions attributed to him. [688-691]

Although, at a robbery trial, an erroneously admitted description of one of the robbers had some tendency to strengthen a witness's in-court description of the robber's clothing, this court concluded, on review of the entire record, that the error either did not influence the jury or had but slight effect. [691-693]

At a robbery trial, circumstantial evidence of the defendant's guilt, together with a witness's in-court description of the robber's clothing, matching the defendant's clothing on the night in question, warranted the jury in finding the defendant guilty. [693]

The integrity of a grand jury proceeding was not impaired either by a police witness's characterization of a witness's identification of the defendant at a probable cause hearing or by the Commonwealth's failure to inform the grand jurors of the inability of other witnesses at the probable cause hearing to identify the defendant. [693-694]

A robbery defendant was not entitled to suppression of a remark he made at a police station during a videotaped booking procedure, concerning the logo on a certain shirt that had been used as a mask, on the basis of the defendant's contention that the video recording, if properly made, would have depicted the position of the shirt and shown that the defendant was able to see the logo before making the remark, thus negating the inference that he had seen the shirt previously. [694-695]

At a criminal trial, the failure of the clerk to announce orally in open court the jury's verdict on one count of the indictment rendered the verdict on that count a nullity. [695-696]

INDICTMENT found and returned in the Superior Court Department on January 12, 1988.

A pretrial motion to suppress evidence was heard by *James F. McHugh, III*, J., and the case was tried before him.

*Milly Whatley*, Committee for Public Counsel Services, for the defendant.

*Susan B. Carnduff*, Special Assistant District Attorney, for the Commonwealth.

FINE, J. A McDonald's restaurant in Burlington was held up by two masked gunmen just prior to closing on October 28, 1987. Five McDonald's employees were present during the incident. Robert Anderson was arrested nearby shortly after the robbery, and the defendant was arrested in the same vicinity about an hour later. The defendant and Anderson were both indicted on four counts of armed robbery, and they were brought before a jury together for trial. Anderson pleaded guilty before counsel made their opening statements, and the trial proceeded against the defendant alone. He was convicted on all four counts. On appeal, he contends that (1) the evidence was insufficient to sustain a guilty verdict, (2) grand jury proceedings were tainted by the distortion and omission of evidence, (3) hearsay testimony by a police officer should have been excluded, (4) certain statements made by the defendant during the booking procedure should have been excluded, and (5) the verdict on the fourth count should be set aside because it was not announced and affirmed in open court.

There is merit to the claim that the judge improperly admitted hearsay evidence over a reasoned and pointed objection. However, based upon our review of the record at trial, we conclude that the error was harmless. We comment briefly on the defendant's other contentions, but, except as to the verdict on the fourth count, we think they have no merit.

1. *The hearsay issue.* (a) *Was there error?* We describe so much of the factual background as is necessary to place the evidentiary ruling in context. The defendant and Anderson were friends. Several hours before the robbery they were

seen together in a car with two other young men about a quarter of a mile from the Burlington McDonald's. One of the two other young men was Steven Archer. During the incident at McDonald's, the robbers wore masks, one red and one blue. It was assumed by both the prosecution and the defense that Anderson was the one wearing the blue mask. The key issue at trial was the identity of the robber wearing the red mask. The defendant attempted to suggest it was not he, but Archer. As part of their investigation on the night of the robbery, the police spoke with both Archer and the fourth individual seen in the car with the defendant and Anderson earlier in the evening. Archer was wearing tan pants and work boots at the time he was questioned. Putting aside the question of clothing, both Archer and the defendant fit the witnesses' general descriptions of the individual wearing the red mask.

A Burlington police officer arrived promptly at the scene of the robbery. He and Abdullah Yusuf, a McDonald's employee who was present during the robbery, began searching the parking lots, embankments, and marsh behind McDonald's and other neighboring businesses in the area towards which Yusuf believed the robbers had fled. Yusuf and the officer spotted Anderson running, chased him on foot, and found him, along with a McDonald's bag filled with money and a knotted blue tee shirt, later identified as the blue mask worn by one of the robbers.

With the help of a police dog, the police continued their search for the robber who wore the red mask. Although several times the dog led his handler to the shore of the marshy pond behind McDonald's, the search was abandoned. About an hour after the robbery, the occupant of an apartment located over a liquor store near McDonald's called the police claiming to have seen someone crouched behind a fence in her back yard.

Police officers immediately returned to the area. In the yard behind the liquor store they found a bag, later identified as one used in the robbery, containing $586.41. The defendant was then spotted lying hidden in the bushes on the other

side of the fence behind the liquor store yard. When ordered to "freeze," the defendant dove into the pond. He remained there for five or ten minutes. He was arrested after swimming to the opposite shore. At the time of his arrest the defendant was wearing blue jeans, a white sleeveless tee shirt, and work boots. Early the next day, while searching the area, a police officer found a red bandana at the water's edge, about five feet from where the defendant had been seen. The bandana was later identified as the mask worn by one of the robbers. Also found in the marshy area behind McDonald's were a BB rifle, footprints leading towards the liquor store, and a jacket.

None of the witnesses was able to make an in-court identification of the defendant as the man with the red mask. In this context, the question of the clothing he wore during the robbery assumed importance. Yusuf was the fifth witness called by the Commonwealth. Asked to describe that clothing, the witness stated that the robber was wearing blue jeans, work boots, and a jacket, which was zipped up.[1] As the defendant was wearing blue jeans and work boots when he was arrested and a jacket was found near where he was hiding, Yusuf's testimony tended to implicate the defendant. Two other McDonald's employees who were witnesses, how-

---

[1] Yusuf's testimony in this regard was as follows:

Q: "Now, also, do you remember what the man with the red bandanna was wearing?"

A: "I remember he was wearing work boots."

Q: "Do you remember what color the work boots were?"

A: "Brown, light — light brown."

Q: "Light brown? Okay. And what about —"

A: "I'm not sure light or dark, but it was a tan boot."

Q: "Tan boots?"

A: "Yah."

Q: "Okay. And what about the pants?"

A: "He was wearing blue jeans."

Q: "And do you remember what he was wearing on his upper body?"

A: "Was wearing a jacket, which I don't remember what kind of jacket it was."

Q: "And could you tell whether or not he had anything under his jacket?"

A: "Yes, but he was — his jacket was zipped up so —"

ever, testified that they thought the man in the red mask had worn tan pants,[2] the same color pants worn that night by Archer.

Sergeant Walter Bevis was the tenth witness called by the Commonwealth. The defendant raised an objection by a motion in limine to Sergeant Bevis's proposed testimony, offered by the Commonwealth to corroborate Yusuf's in-court description. The judge was informed by defense counsel that Sergeant Bevis's testimony about Yusuf's description of the clothing worn by the robber on the night of the robbery would include reference to a white shirt. As the defendant was wearing a sleeveless white tee shirt when he was arrested, Sergeant Bevis's testimony tended to reinforce the credibility of Yusuf's testimony that the man in the red mask wore blue jeans, not tan pants. The judge denied the defendant's motion in limine, stating that it was inconsequential that "the details of the assertively corroborating testimony do not match with perfect congruence the testimony given by the witness . . . ." Sergeant Bevis proceeded to tell the jury

---

[2]Kathleen Brennan testified in this respect as follows on direct:

Q: "And do you know what he was wearing?"

A: "I don't really remember. I have no idea what he was wearing for — I know he had a jacket on, but what it looked like I couldn't tell you. I thought he had tan pants. They looked tan to me, and he wasn't wearing a hat. I don't know if he had gloves. I don't know what kind of shoes he was wearing."

Q: "Now, when you say he had tan pants, are you sure he had tan pants on?"

A: No, not sure."

On cross-examination, she described the pants as of "tannish color."

Thayne Eastman testified in this respect as follows on direct:

Q: "Now, also, in terms of what either of those two men were wearing, do you remember what any of the men — either of those two men were wearing that night?"

A: "One had a tan brown leather jacket on, jeans, and I remember tan pants and work boots, and that's about it."

Q: "Do you know which one had either of those —"

A: "No, I don't."

On cross-examination she responded affirmatively when asked if one of the robbers was wearing jeans and one was wearing tan pants and work boots.

that Yusuf described the robber to him after the incident as wearing "a white shirt, blue jeans, and work boots."

The defendant's contention on appeal is that Sergeant Bevis's testimony should have been excluded as inadmissible hearsay. The Commonwealth contends that it was not hearsay because it was an extrajudicial identification and Yusuf was available for cross-examination. Prior extrajudicial identifications may be admissible as substantive evidence even if the identifying witness fails to make an in-court identification. See *Commonwealth* v. *Weichell*, 390 Mass. 62, 71 (1983), and cases cited; *Commonwealth* v. *Daye*, 393 Mass. 55, 61 (1984). Underlying these decisions is a recognition that an identification made soon after an event is generally more reliable than one made later when memory may have faded and suggestiveness might have become a factor. *Commonwealth* v. *Weichell*, 390 Mass. at 71. We assume, at least for purposes of this case, that any hearsay exception relating to extrajudicial identifications would also relate to an extrajudicial description of clothing. See *id.* at 72. The defendant has not argued otherwise.

There are limitations to the hearsay exception, however. "Where . . . the extrajudicial identification is established not by the identifying witness but by a person who observed the identification, . . . [the] probative worth is outweighed by 'the hazard of error or falsity in the reporting.' McCormick, The Turncoat Witness: Previous Statements as Substantive Evidence, 25 Tex L. Rev. 573, 588 (1947). Where there is a dispute not only as to the accuracy of a pretrial identification, but also as to whether the identification was in fact made, 'the evidential value of the prior identification is almost completely dissipated.' *Commonwealth* v. *Swenson*, 368 Mass. 268, 273 n.3 (1975)." *Commonwealth* v. *Daye*, 393 Mass. at 61.

That is the precise problem here. The prosecutor did not ask Yusuf whether he had ever given a description of the robber to the police. Not only did Yusuf not acknowledge giving Sergeant Bevis a description of the robber's clothing, but the description he offered in his own testimony varied

from the earlier description ascribed to him. As the evidence in the case was developing, the variance was material. Considering Yusuf's failure to acknowledge giving the description, the material inconsistency, and Yusuf's own testimony that when he observed the robber his jacket was zipped up, the risk of error in Sergeant Bevis's reporting is significant. His testimony may have been influenced, perhaps unconsciously, by his knowledge of the clothing the defendant was actually wearing at the time he was arrested. In such circumstances, the hearsay exception was not applicable. See *Commonwealth* v. *Daye*, 393 Mass. at 57-61; *Commonwealth* v. *Warren*, 403 Mass. 137, 141 (1988); *Commonwealth* v. *Mendrala*, 20 Mass. App. Ct. 398, 400-401 (1985); *Commonwealth* v. *Seminara*, 20 Mass. App. Ct. 789, 795-796 (1985); *Commonwealth* v. *Bassett*, 21 Mass. App. Ct. 713, 719-720 (1986).

Contrary to the Commonwealth's argument on appeal, it is not an answer that Yusuf was available for cross-examination by the defendant. Contrast Fed.R.Evid. 801(d)(1)(C) (1975). Defense counsel was not required "to put [her] client's head in the lion's mouth" by questioning Yusuf about a description he might have given to the police. *Commonwealth* v. *Seminara*, 20 Mass. App. Ct. at 796.

(b) *Was the error harmless?* It is undisputed that the defendant was wearing blue jeans, a white sleeveless tee shirt, and work boots when he was arrested. In his direct testimony Yusuf described what he remembered the man in the red mask to have been wearing: blue jeans, work boots, and a jacket. As a result of the erroneous ruling, the jurors were informed that, soon after the robbery, Yusuf included reference to a white shirt in his description of the clothing worn by the man with the red mask, and, thus, his description matched the clothing the defendant was wearing soon after the robbery. The reference to the white shirt, therefore, had a tendency to strengthen Yusuf's trial testimony that the man was wearing blue jeans. The question of the pants color had significance because two other witnesses to the robbery thought that the man was wearing tan pants. Archer, who

had been with the defendant and Anderson earlier in the evening and who, like the other two, fit the broad general descriptions given by the witnesses, was wearing tan pants that night. The defendant contends that the hearsay evidence might have been a factor in convincing the jury that the witnesses who testified that the man in the red mask wore tan pants were mistaken, and the outcome of the trial, therefore, might have been affected by the error.

We think the error was harmless, although we acknowledge that the issue, in the circumstances, is a close one. The one mention of the white shirt was not repeated during the course of the trial. Other than mentioning the color, Yusuf was not said to have described the shirt in any way, and white shirts are very common. The prosecutor did not mention Yusuf's statement about the white shirt in his closing argument, and it was not mentioned in the judge's instructions. The prosecutor may actually have undercut the force of the reference to the white shirt by arguing that the defendant must have shed his jacket after the robbery so that the witnesses would not be able to recognize his clothing. Based on the entire record of the trial, we think the effect of the brief reference to the white shirt on the credibility of Yusuf's testimony that the man in the red mask was wearing blue jeans, not tan pants, was negligible.

The defendant was vigorously and competently represented by counsel, and in all respects other than the admission of the hearsay the trial was conducted fairly. Moreover, the evidence of the defendant's guilt was very strong. It was established that he was friendly with Anderson (the man in the blue mask), that they were together earlier in the evening a quarter of a mile from McDonald's, and that he fit the general description given by the witness. Although those facts apply equally to Archer, no one placed Archer in the vicinity of the McDonald's restaurant after the robbery. That none of the eyewitnesses ever identified the defendant is not surprising because the robber wore a mask. The circumstantial evidence of the defendant's involvement in the robbery was particularly compelling. He hid from the police in a marshy

pond on a late October night when the temperature was in the forties, and he told the police when he was arrested about an hour after the robbery that he had been in the water for an hour. The red bandana was found not far from where he had been hiding. The bag of money was also found nearby, and the gun was found on route to the pond from the rear of McDonald's. The suggestion made by the defendant that he was hiding from the police because they had a warrant for his arrest as a result of a traffic offense was hardly persuasive given the length of time he was in the water and his appearance in public earlier in the evening.

We are mindful of the danger in speculating about a jury's reasoning and the restraint that should be exercised in doing so, see *Commonwealth* v. *Seminara*, 20 Mass. App. Ct. at 797-798. Nevertheless, on our review of the entire record, we conclude that the error "did not influence the jury, or had but slight effect." *Id.* at 798. See *Commonwealth* v. *Reed*, 397 Mass. 440, 443 & n.4 (1986).[3]

2. *The remaining contentions.*

(a) On the basis of the strong circumstantial evidence of the defendant's guilt discussed in the preceding section and Yusuf's in-court description of the robber's clothing matching the defendant's clothing on the night in question, a rational jury could have found the essential elements of the crime beyond a reasonable doubt. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979).

(b) The integrity of the grand jury proceedings was impaired neither by Sergeant Bevis's characterization of the witness's identification of the defendant at the probable cause hearing, nor by the Commonwealth's failure to inform the grand jurors that no other eyewitness could identify the defendant at the probable cause hearing and that none of the

---

[3]The case was not tried on a joint enterprise theory, and no joint enterprise instruction was given to the jury. Thus, if the defendant in some way participated in the robbery, but was not the man in the red mask, he would have been entitled to an acquittal. Even so, we think the evidence erroneously admitted did not significantly influence the outcome.

eyewitnesses chose the defendant's picture from a photo array.

Sergeant Bevis testified before the grand jury that the eyewitness had stated at the probable cause hearing that the defendant "looked like" one of the robbers. In fact, when asked to look around the room and see if she recognized anyone as having been in McDonald's on the night of the robbery, the eyewitness had pointed out the defendant but said, "I'm not sure — certain. No, I can't be certain." Although Sergeant Bevis may have cast the witness's identification in a slightly stronger light, his testimony at least conveyed an impression of the eyewitness's uncertainty and was not so false or deceptive as to warrant dismissal of the indictment. Contrast *Commonwealth* v. *O'Dell*, 392 Mass. 445, 449 (1984).

Nor was dismissal required because of the Commonwealth's failure to inform the grand jurors of the inability of the other witnesses to identify the defendant. A prosecutor is not required to inform the grand jury of every failure of a witness to make an identification. See *Commonwealth* v. *McGahee*, 393 Mass. 743, 747-748 (1985). The grand jurors knew the robber was masked and that the prosecutor was relying principally on circumstantial evidence. See *Commonwealth* v. *Mayfield*, 398 Mass. 615, 621 (1986).

(c) The defendant challenges the denial of his motion to suppress statements made during the course of his booking which related to a blue tee shirt used by Anderson as a mask. When the defendant arrived at the police station after his arrest, he was cold and wet from his venture into the pond. After declining several offers of a dry blanket, he pointed to the blue shirt, which was on the booking officer's desk, and asked if he could put it on. When he was informed that the shirt was the "mask," the defendant replied, "Bedford Fire Department, right? . . . That's what it says on the side of it." Soon afterwards the defendant claimed that the shirt had been tied in such a way that he *could* read the logo and accused the police at the station of "framing" him.

If the shirt was knotted in such a way that the logo was not visible, the defendant's statement would suggest that he

had seen the blue shirt prior to its use as a mask. The police officers' testimony at trial that the shirt *was* knotted so that the logo was not visible was not contradicted, and the defendant's statement was used as evidence of his guilt.[4] His motion to suppress was based upon his contention that the police had made a videotape of the booking procedure, which did not depict the condition of the shirt and the visibility of the logo when he made the statement. A videotape properly made, the defendant contends, would have constituted potentially exculpatory evidence.

In denying the motion to suppress, the judge found that the condition of the shirt was not recorded on the videotape because the police had acted without regard to whether it was recorded rather than with an intention to keep it out of the camera's range. We are bound to accept the judge's finding. The case is not one, therefore, in which the police, by selective recording, attempted to gain an unfair advantage over the defendant. Compare *Commonwealth* v. *Fernette*, 398 Mass. 658, 664-665 (1986); *Commonwealth* v. *Santiago*, *ante* 207, 221-222 (1991). At most, there was an inadvertent failure on the part of the police to gather evidence, and suppression of the statements, therefore, would not be required. See *Commonwealth* v. *Neal*, 392 Mass. 1, 8 (1984).

(d) The indictment had four counts, each relating to a McDonald's employee present during the robbery, and four verdict slips were given to the jury before they began their deliberations. After the deliberations, the clerk received the four verdict slips and asked the foreman to recite the verdicts on counts one, two and three. The foreman responded "guilty" to each request. The verdict slip on count four also showed a guilty verdict, but the clerk never asked the foreman to announce it. The clerk asked the entire jury whether the defendant was guilty and received an affirmative response. The defendant did not object to this procedure. Guilty verdicts on all four counts were entered in the record,

---

[4]The evidence had little, if any, probative force given the unchallenged evidence that the defendant and Anderson had been together just hours before the robbery when the defendant probably saw the shirt.

and one "general" sentence to M.C.I., Cedar Junction was imposed.

We think the oversight in taking the verdict renders the verdict on count four a nullity. Although Mass.R.Crim.P. 27(a), 378 Mass. 897 (1979), requires a jury in a criminal case to "file a verdict slip with the clerk upon the return of the verdict" and does not mention any requirement of an oral announcement from the foreman or public affirmance, the decisional law makes clear that a jury verdict in a criminal case is not effective unless there has been oral affirmance of the verdict by the jurors. See *Commonwealth* v. *Tobin*, 125 Mass. 203, 207 (1878); *A Juvenile* v. *Commonwealth*, 392 Mass. 52, 56-57 (1984); *Commonwealth* v. *Martell*, 407 Mass. 288, 292 (1990); *Commonwealth* v. *Kalinowski*, 12 Mass. App. Ct. 827, 829-830 (1981); *Commonwealth* v. *Diaz*, 19 Mass. App. Ct. 29, 31 n.2 (1984); Smith, Criminal Practice and Procedure § 1967 (2d ed. 1983). Because the verdict on count four was never received aloud, the jury never affirmed it. Although the ineffectiveness of the verdict on count four has little or no practical significance in this case, the proper course is to afford the defendant the opportunity for resentencing.

The judgment is reversed. The verdict on count four is set aside. The defendant is to be sentenced on counts one, two, and three.

*So ordered.*